**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | | |
|---|---|---|
| KIRA N. D., | ) | No. CV 19-7628-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Kira N. D.[1] ("plaintiff") filed this action on September 3, 2019, seeking review of the Commissioner's denial of her applications for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments.  The parties filed Consents to proceed before a Magistrate Judge on September 17, 2019, and October 11, 2019.  Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on July 28, 2020, that

---

[1]    In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1) first name and middle and last initials, and (2) year of birth in lieu of a complete birth date.  See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born in 1975.  [Administrative Record ("AR") at 30, 274.]  She has past relevant work experience as an actor.  [Id. at 30, 111.]

On June 15, 2015, plaintiff protectively filed an application for a period of disability and DIB and SSI payments alleging that she has been unable to work since November 24, 2012.  [Id. at 21; see also id. at 274-77.]  After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [Id. at 208-09.]  A hearing was held on May 1, 2018, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [Id. at 73-119.]  A vocational expert ("VE") also testified.  [Id. at 110-18.]  On August 2, 2018, the ALJ issued a decision concluding that plaintiff was not under a disability from November 24, 2012, the alleged onset date, through August 2, 2018, the date of the decision.  [Id. at 21-32.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [Id. at 273.]  When the Appeals Council denied plaintiff's request for review on June 28, 2019 [id. at 1-6], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means

only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Revels, 874 F.3d at 654 (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsburry,

468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2.  Lounsbury, 468 F.3d at 1114.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

## B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since November 24, 2012, the alleged onset date.[2]  [AR at 23.]  At step two, the ALJ concluded that

---

[2]   The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through March 31, 2015.  [AR at 23.]

4

plaintiff has the severe impairments of degenerative disc disease, functional dyspepsia, and allergies.  [Id.]  At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing.  [Id. at 24.]  The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[4] except she is limited to frequent postural activities and to an indoor location with no animals and simple, routine tasks with no public contact.  [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform her past relevant work as an actor.  [Id. at 30, 111-12.]  At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "inspector hand packager" (Dictionary of Occupational Titles ("DOT") No. 559.687-074), as a "mail clerk" (DOT No. 209.687-026), and as a "router clerk" (DOT No. 222.687-022).  [AR at 31, 112-13.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of November 24, 2012, through August 2, 2018, the date of the decision.  [Id. at 32.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he:  (1) failed to include plaintiff's "multiple

---

[3]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).

chemical sensitivity/vasomotor rhinitis/hyper[]osmia as a severe impairment" at step two;  (2) rejected the opinions of plaintiff's treating sources, Nurse Practitioner ("NP") Anna Mangini, E. Palliccia, M.D., and Kevin Ghassemi, M.D.; and (3) determined plaintiff's RFC and ability to perform alternative work.  [JS at 2.]  As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.     THE ALJ'S STEP TWO FINDING

### 1.     Legal Standard

At step two of the five-step process, plaintiff has the burden to provide evidence of a medically determinable physical or mental impairment that is severe and that has lasted or can be expected to last for a continuous period of at least twelve months.  Ukolov v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)); see 20 C.F.R. §§ 404.1508 (effective through March 26, 2017), 404.1509, 404.1520(a)(4)(ii); see generally Bowen v. Yuckert, 482 U.S. 137, 148, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (Secretary may deny Social Security disability benefits at step two if claimant does not present evidence of a "medically severe impairment").  This must be "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508 (effective through March 26, 2017).  The Commissioner's regulations define "symptoms" as a claimant's own description of her physical or mental impairment.  20 C.F.R. § 404.1528 (effective through March 26, 2017).  "Signs," by contrast, "are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements . . . [,] [and] must be shown by medically acceptable clinical diagnostic techniques."  Id.  Finally, "[l]aboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques."  Id.  A claimant's statements about an impairment (i.e., "symptoms") "are not enough [by themselves] to establish that there is a physical or mental impairment."  Id.

Step two is "a de minimis screening device [used] to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  A "severe" impairment, or combination of

impairments, is defined as one that significantly limits physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520. An impairment or combination of impairments should be found to be "non-severe" only when the evidence establishes merely a slight abnormality that has no more than a minimal effect on an individual's physical or mental ability to do basic work activities. Yuckert, 482 U.S. at 153-54 & n.11 (Social Security claimants must make "de minimis" showing that impairment interferes with ability to engage in basic work activities) (citations omitted); Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005); see also 20 C.F.R. § 404.1521(a). "Basic work activities" mean the abilities and aptitudes necessary to do most jobs, including "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . ." 20 C.F.R. § 404.1521(b). It also includes mental functions such as the ability to understand, carry out, and remember simple instructions, deal with changes in a routine work setting, use judgment, and respond appropriately to supervisors, coworkers, and usual work situations. See Soc. Sec. Ruling ("SSR")[5] 85-28.

When reviewing an ALJ's findings at step two, the Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." Webb, 433 F.3d at 687 (citing Yuckert, 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.")).

### 2.    The Parties' Contentions

Plaintiff contends that the record evidence demonstrates that she experiences headaches, fatigue, and malaise, among other things, as a result of her sensitivity to environmental irritants such as perfumes, odors, and smoke. [JS at 3.] She argues that the ALJ mischaracterized an

---

[5]    "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

October 2015 treatment note when he stated that it reflects that plaintiff presented with "nothing more than ongoing allergy symptoms for a cat and, to a mild degree, ragweed," and states that she presented "for allergies in general, not specifically for those problems." [Id. at 3 (citing AR at 849).] She notes that the next page of that same treatment note indicates allergies resulting from "other irritants including medications, dairy products, molds and smuts." [Id. (citing AR at 850).] Plaintiff notes that her allergy tests do not include all environmental irritants, and states that in December 2015 she was tested only for goose feathers, false ragweed, Chinese elm, mites, cottonwood, cat dander, bluegrass, Bermuda grass, maple, meadow fescue, mugwort, olive tree, orchard grass, sycamore, white mulberry, and white oak. [Id. at 4 (citing AR at 922-23).] She was later tested for other trees and grasses and, despite medication and allergy shots, her symptoms continue, including headaches, fatigue, and malaise. [Id. (citing AR at 931, 936-37).] Indeed, she notes that in 2016 through mid-2017 she received allergy shots about once a week, and then once a month from November 2017 through April 2018. [Id. (citing AR at 1080-82, 1091, 1095-96, 1104, 1107, 1109-11, 1112-13).] With respect to her severe allergy to cats, plaintiff takes issue with the ALJ using against her the fact that she had her cat until sometime in 2016. [Id. (citing AR at 30).] She states that she had her cat for a very long time before developing an allergy and she tried everything she could -- including allergy shots -- to be able to keep her cat, but when her symptoms continued, she eventually had to find a new home for the cat. [Id. (citing AR at 88, 108).]

Plaintiff also notes that her doctors and treating sources have diagnosed her with hyperosmia ("a heightened and hypersensitive sense of smell that . . . can be caused by allergies, among other conditions"), vasomotor rhinitis ("an inflammation of the membranes inside the nose" that may be caused by irritants or allergens, or that may be idiopathic[6]), and multiple chemical

---

[6]   Vasomotor rhinitis ("VMR"), also referred to as nonallergic rhinitis, consists of symptoms that are "similar to those of hay fever (allergic rhinitis), but none of the usual evidence of an allergic reaction is present." http://www.mayoclinic.or/diseases-conditions/nonallergic-rhinitis (last visited Aug. 14, 2020). In individuals with this condition "there appears to be a hypersensitive response to stimuli such as a dry atmosphere, air pollutants, spicy foods, alcohol, strong emotions, and some medications. Indeed any particulate matter in the air . . . can bother people
(continued...)

1    sensitivity.  [Id. (citing AR at 556, 558, 564, 569, 842-43, 997, 1004, 1007, 1056, 1065, 1066,

2    1070).]  She argues that these diagnoses indicate "sensitivity to the irritants, not allergies to them,"

3    and although hyperosmia and vasomotor rhinitis may be caused by allergies, "it is errant to equate

4    these conditions to allergies and for the ALJ to reject the sensitivities, which her treating sources

5    have noted cause[] her significant functional impairment."  [Id.]  Plaintiff submits that the ALJ

6    "cannot pick and choose the evidence that supports [his] claim . . . [and] must not be selective,

7    exaggerate, or mis-attribute statements not made by the doctor."  [Id. at 4-5 (citations omitted).]

8    She states that her sensitivity to environmental irritants "would pose more than a minimal impact

9    on her ability to work and would be a severe impairment."  [Id. at 5.]

10         Defendant counters plaintiff's arguments, noting that the ALJ properly found plaintiff's

11   allergies, functional dyspepsia, and degenerative disc disease to be severe.  [Id. at 6 (citing AR

12   at 23).]  He asserts that the ALJ stated that he "considered all of the functional limitations

13   established by the reliable evidence, not just the ones identified as severe."  [Id. (citing AR at 23,

14   24).]  Defendant contends, therefore, that "the ALJ considered the functional limitations

15   established by the reliable medical evidence, regardless of severity," "but properly determined that

16   the record as a whole did not support the inclusion of additional restrictions in the [RFC]

17   assessment."  [Id.]  Defendant states that the ALJ considered the medical evidence, including the

18   "relatively unremarkable exam findings and diagnostic test results"; the fact that plaintiff's

19   symptoms were controlled with treatment; the fact that "her actions were inconsistent with the

20   level of symptoms she alleged"; and the fact that "no less than three physicians concluded that

21   Plaintiff retained the ability to perform at least light exertion level work with no additional

22   restrictions related to her purported sensitivities."  [Id. (citing AR at 24-30).]  Defendant then

23   references the various records cited to by the ALJ, noting that although plaintiff complained of

24   nasal congestion in January 2015, triggered by smells, temperature changes, heat, wind, and

25

26   _____

27   [6](...continued)
     with   VMR,   even   though   they   are   *not  actually  allergic*   to   these   things."
     http://www.asthmafoundation.org.nz (last visited Aug. 14, 2020) (emphasis added); see also JS

28   at 4 n.2.

dust, "clinical examination of her nose, mouth and throat were normal and she exhibited no rashes or lesions"; in September 2015, she "described being very sensitive to nonspecific triggers, including smoke, perfume, manmade fireplace logs, dairy, and animals, yet objective examination did not elicit any abnormalities"; in October 2015, she alleged severe allergic rhinitis, "yet examination of her eyes, nose, throat, and abdomen were unremarkable"; in May 2017 she complained of a sore throat and sinus congestion after being around a construction area, yet examination showed "she had normal non-labored respirations, was alert and oriented, had normal skin, full range of motion of all extremities, and normal mood and affect"; diagnostic testing such as an abdominal ultrasound, MRIs, and "thorough laboratory work ups all yielded unremarkable results"; CT scans of her sinuses in October 2014 and October 2015 were "normal, showing only a slight nasal septal deviation"; and a December 2015 brain MRI was also normal. [Id. at 7 (citing AR at 26-28, 486-88, 492, 536-65, 581-82, 597-601, 853-56, 864, 971, 1076).]

Defendant also asserts that the ALJ properly found that treatment controlled plaintiff's symptoms. For instance, treatment records from 2013 showed plaintiff's functional dyspepsia was "well controlled with current medication"; in January 2015 she reported her swallowing problems were "well controlled" with medication and her only issue was post-nasal drainage in response to strong odors; in September 2015 she reported she had some improvement with allergy medication, and she was able to eat better; and she admitted that an injection of dexamethasone would resolve her symptoms when they flared. [Id. at 7-8 (citing AR at 26-27, 30, 574, 598, 840, 1083).]

Finally, defendant states that the ALJ properly observed that plaintiff's actions were inconsistent with her alleged symptoms. For instance, in March 2015 she reported doing yardwork for the past four weeks; she reported that she walked half a mile to the grocery store once to twice a week, prepared meals, and cleaned; and although "she claimed to suffer from severe cat allergies, she continued to own a cat until at least 2016." [Id. at 8 (citing AR at 26-27, 30, 319-21, 590, 1083).] Defendant also observes that plaintiff had her cat "for nearly four years after the alleged onset of disability" and "continued to have voluntary contact with an animal that purportedly caused her extreme disabling allergic reaction." [Id. at 9 (citing AR at 1083).]

1    Defendant concludes that the ALJ "accounted for the allergies that the record supported, including

2    environmental and animal allergens, by limiting Plaintiff to indoor work not around animals and

3    without public contact." [Id. at 10 (citing AR at 24).]

4         Plaintiff responds that the fact that her functional dyspepsia and swallowing problems were

5    noted as being controlled with medication on certain visits, "does not mean that her other

6    symptoms from her multiple chemical sensitivity, hyperosmia, and vasomotor rhinitis were well

7    controlled." [Id. at 10.]  She points out that the note cited to for that proposition also indicates

8    "that her post nasal drainage in response to strong odors was not controlled." [Id. (citing AR at

9    566).]  She notes that dexamethasone -- which helps resolve her symptoms when they flare -- is

10   not something she takes regularly (like her injections). [Id. at 11 (citing AR at 1083-84).]  She also

11   states that a February 11, 2016, record indicates she has dizziness, nausea and vomiting, and

12   throat tightening "when around offenders such as perfume, air fresheners, smoke, and other

13   irritants." [Id. (citing AR at 1062).]  That treatment note also reflects that plaintiff wore a surgical

14   mask during the examination to avoid smells and was "[o]verwhelmed by smell" after the treating

15   provider washed her hands to examine her. [AR at 1064.]  Plaintiff asserts that "the ALJ's belief

16   that doing yardwork is inconsistent with [plaintiff's] claim of multiple chemical sensitivity and

17   hyperosmia highlights the issue of not including this impairment among her severe impairments."

18   [JS at 11.]  She states that she has consistently reported that certain scents trigger her symptoms,

19   such as perfume, smoke, or other chemical irritants, which she explains is "different than her

20   allergies to cats and ragweed." [Id.]  Doing yardwork does not necessarily involve exposure to any

21   chemical irritant and, in any event, plaintiff also notes that she does such work for "maybe 30

22   minutes at a time," wears a mask, and only gets nauseous if her neighbors are "using gas blowers

23   or heavy fabric softener." [Id. (citing AR at 320).]  Plaintiff contends that her problems extend

24   beyond her allergies and, although defendant states that "at most" plaintiff complained of a stuffy

25   nose, the records also indicate flu-like symptoms, dysphagia, chronic post nasal drainage that

26   triggers nausea and vomiting, as well as fatigue. [Id. at 12-13 (citing AR at 849, 842, 849).]  She

27   also states that there are many records that reflect her diagnoses of hyperosmia, vasomotor

28   rhinitis, and multiple chemical sensitivity. [Id. at 13 (citing AR at 1005).]

### 3.    Analysis

The ALJ acknowledged several times in his decision that plaintiff has been "assessed [by her treating providers at UCLA] as having vasomotor rhinitis," as having "post-nasal drainage in response to various strong odors," and as "hypersensitive to many things in her environment." [AR at 26 (citing id. at 564, 566, 568-69, 581); see also id. at 28, 29.]  The Court finds that the ALJ's failure at step two to distinguish between plaintiff's diagnosed allergies to cats and ragweed, among other things, and her other diagnoses of hyperosmia, vasomotor rhinitis, and multiple chemical sensitivity was error as these latter diagnoses do not necessarily indicate the presence of allergies, yet have many similar symptoms.  This error was compounded by the ALJ's relevant hypothetical to the VE, which included a limitation to "indoor locations only with no work with animals and simple, routine tasks with no public contact."  [AR at 112.]  This hypothetical clearly took into account plaintiff's cat allergy as well as, arguably, her mild allergy to ragweed, but his reason for limiting plaintiff to "no public contact" is far from clear.

If the ALJ's intent in including "no public contact" was to give some credence to plaintiff's diagnoses of hyperosmia, vasomotor rhinitis, and multiple chemical sensitivity, and her testimony that odors from soaps, perfumes, fabric softeners, and smoke (among other things) are irritants that cause her to experience nausea, vomiting, dizziness, and fatigue, then he should have explained why he found a limitation to no public contact but did not provide any limitation with respect to plaintiff's contact with supervisors and coworkers, with whom she would be in contact in a work environment.  Logically, environmental triggers that might be "present" on the general public in the form of soaps, perfumes, smoke, and so on, would also be present on supervisors and coworkers.

Indeed, plaintiff's counsel asked the VE whether there would still be work that could be performed if the hypothetical individual for whom the VE determined alternate work would be available "must avoid all exposure to extreme cold, extreme heat, high humidity, cigarette smoke, perfumes, any kind of od[ors] such as soldering fluxes, solvents, or cleaners or additional fumes, odors, or gases and any other chemical product."  [AR at 115.]  The VE noted that an indoor job in an office is not typically going to have issues with heat, cold, humidity or smoking.  [Id.]  She

further explained that the thing that is unpredictable in a work environment is exposure to perfumes and stated that "it would be very difficult for that person to find a work environment that would not have" such odors.  [Id. at 115-16.]  Plaintiff's counsel then asked whether the VE was stating that "around coworkers or -- or supervisors,"  the individual would not be "able to predict the perfumes or other odors around -- that they are using," and the VE confirmed that was indeed the case because "those are situations that cannot be predicted," and there are "some environments that say don't wear perfume but people still wear them or they'll wear scented lotion or . . . they'll shampoo with . . . some kind of odor -- you know, fragrance.  . . . So even if they're not wearing perfume or cream that has, you know, perfume in it, . . . they may shower -- or their clothes may have scents as well -- when they're washing their clothes or, you know, softeners. . . . I would say it would be very difficult to find [a] work environment without any of these odors, chemicals, cleaners in them . . . or around that environment."  [Id. at 116-17.]  The VE also confirmed that even though smoking is not allowed indoors, there could still be somebody who came in smelling like smoke.  [Id. at 117.]

In light of the foregoing, the Court determines that the ALJ, in limiting contact with the public but not with coworkers and supervisors, did not properly consider plaintiff's diagnoses of hyperosmia, vasomotor rhinitis, and multiple chemical sensitivity at step two.  Remand is warranted on this issue.

**B.    THE ALJ'S RFC DETERMINATION AND CONSIDERATION OF THE OPINIONS OF PLAINTIFF'S TREATING SOURCES**

**1.    Legal Standard**

An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-9p, 1996 WL 374184, at *1 (1996).  It reflects the most a claimant can do despite her limitations.  See Smolen, 80 F.3d at 1291.  An RFC must include an individual's functional limitations or restrictions as a result of all of her impairments -- even those that are not severe (see 20 C.F.R. § 404.1545(a)(1)- (2), (e)) -- and must assess her "work-related abilities on a function-by-function basis."  SSR 96-

9p, 1996 WL 374184, at *1; see also Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009) ("an RFC that fails to take into account a claimant's limitations is defective").  An ALJ errs when he provides an incomplete RFC ignoring "significant and probative evidence." Hill v. Astrue, 698 F.3d 1153, 1161-62 (9th Cir. 2012) (further noting that the error is not harmless when an ALJ fails to discuss significant and probative evidence favorable to a claimant's position because when the RFC is incomplete, the hypothetical question presented to the VE is incomplete and, therefore, the ALJ's reliance on the VE's answers is improper)).  An RFC assessment is ultimately an administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(2). However, an RFC determination must be based on all of the relevant evidence, including the diagnoses, treatment, observations, and opinions of medical sources, such as treating and examining physicians. Id. § 404.1545.  A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

### 2.    Background

As discussed in part above, plaintiff argues that the ALJ erred in formulating the RFC by failing to provide a rationale for his determination that plaintiff would be limited to no public contact.  [JS at 26 (citing AR at 24).]  She notes that it can be presumed from the ALJ's finding that plaintiff's medically determinable impairments include allergies, that the limitation to no public contact would be in relation to her allergies.  [Id.]  She argues that there is no rationale for finding contact with the public to be problematic but not contact with her coworkers and supervisors.  [Id.] Plaintiff notes that  the VE testified that it would "very difficult to find a work environment that was free of irritants and that it would be difficult due to being around coworkers or supervisors, not being able to predict the perfumes or other odors around."  [Id. at 26-27 (citing AR at 115-17).]

Plaintiff also argues that the RFC limitations do not account for all of the environmental

triggers noted by her treating sources NP Mangini,[7] and Dr. Palliccia (who cosigned a medical source statement completed by NP Mangini), and who both also opined that plaintiff must avoid concentrated exposure to dust and pollens, and all exposure to cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, and other fumes/odors/gases or chemicals.  [Id. at 26-27 (citing AR at 1050).]  She states that in addition to failing to provide specific and legitimate reasons to reject the opinions of her treating sources, the ALJ's RFC limitation to an "indoor location without animals and with no public contact would not preclude all of these triggers as coworkers and supervisors can wear perfumes, use soaps and have other irritants such as smelling of cigarette smoke." [Id. at 27.]  Plaintiff further argues that the ALJ failed to include the "uncontroverted opinions" of plaintiff's treating providers that she would be absent from work at least four days a month due to the combination of her impairments and/or treatment and the VE

---

[7]    At the time plaintiff filed her applications for benefits, a certified registered nurse practitioner such as NP Mangini was not generally considered to be an acceptable medical source (see 20 C.F.R. § 404.1502(a)(7), (8)), and "only 'acceptable medical sources' can [provide] medical opinions [and] only 'acceptable medical sources' can be considered treating sources, whose medical opinions may be entitled to controlling weight."  See SSR 06-03p, 2006 WL 2329939, at *2 (citations omitted); but see Popa v. Berryhill, 872 F.3d 901, 907 (9th Cir. 2017):

> We pause to note that Dr. Sorrell possesses a Ph.D[.] in nursing.  The Social Security regulations provide an out-dated view that consider a nurse practitioner as an "other source."  Molina, 674 F.3d at 1111.  The record indicates that Dr. Sorrell served as Popa's primary care medical provider on a regular basis for more than two years.  Dr. Sorrell started seeing Popa in May of 2010 and continued these examinations through the administrative hearing.  No other medical professional actually treated Popa.  Dr. Hart conducted a single examination and Dr. Estes simply reviewed Popa's medical records.  The ALJ's decision to disregard Dr. Sorrell's testimony makes little sense in light of the prominent role that Dr. Sorrell played in Popa's medical treatment.

Here, NP Mangini appears to have acted in a similar capacity with respect to plaintiff as that described by the Ninth Circuit with respect to Dr. Sorrell, in Popa.  The Court also notes that the Administration has issued new regulations and for claims filed on or after March 27, 2017, "acceptable medical source" now *includes* a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, [or a Licensed Physician Assistant] for impairments within his . . . licensed scope of practice." 20 C.F.R. § 404.1502(a)(7), (8).  Thus, such is the state of the Administration's regulations that with respect to a claim filed on March 26, 2017, a NP would not be considered an acceptable medical source, while, incongruously, if the same claim had been filed a day later on March 27, 2017, the very same NP would be elevated in status to an acceptable medical source.  See, e.g., Popa, 872 F.3d at 907.

testified that there would be no work available for such an individual.  [Id. (citing AR at 1060, 1069, 2072).]  Plaintiff submits that because the VE testified that both the environmental limitations and the absence from work would preclude the ability to work, defendant failed to meet his "burden of proof at Step 5 of the sequential evaluation."  [Id. at 28.]

Defendant responds that the ALJ properly found plaintiff retained the RFC "to perform a reduced range of light work involving simple, routine tasks in an indoor location with no animals and no public contact."  [Id. (citing AR at 24).]  He states that plaintiff's "purported reaction to irritants and environmental triggers, however, is entirely without objective support" as, despite her complaints "of nasal congestion triggered by smells, temperature changes, heat, wind, and dust in January 2015, clinical examination of her nose, mouth, and throat were normal and she exhibited no rashes or lesions."  [Id. at 29 (citing AR at 26, 563-65, 581-82).]  Defendant cites several other similar examples in September 2015, October 2015, and May 2017, where despite plaintiff's complaints, examination of her eyes, nose, throat, and/or abdomen were unremarkable or elicited no abnormalities, and a December 2015 MRI of her brain was "normal."  [Id. (citing AR at 27-28, 30, 560, 597-601, 853-56, 864, 971, 1076-77).]  He also argues that plaintiff's symptoms were controlled with medication and, although she complained about allergies to her cat and other allergens, she admitted that an injection of dexamethasone would resolve her symptoms when they flared.  [Id. (citing AR at 26-30, 566, 574, 840, 1083).]  He states that plaintiff's own actions "also undermine the alleged severity of her symptoms."  [Id. at 30.]  For instance, he notes that despite plaintiff's "alleged hypersensitivity and allergies to the environment, in March 2015, she reported doing yardwork for the past four weeks," walking half a mile to the grocery store, shopping once to twice a week, preparing meals, and cleaning; and continued to own a cat until at least 2016 despite claiming to suffer from severe cat allergies.  [Id. (citing AR at 26-27, 30, 319-21, 590, 1083).]  Based on all of these factors, defendant argues that "the ALJ reasonably accounted for the effects of potential irritants and environmental triggers by restricting Plaintiff to working indoors with no animals and no public contact."  [Id. (citing AR at 24).]

Plaintiff replies that notwithstanding defendant's conclusion that the ALJ reasonably accounted for the effects of potential irritants and environmental triggers, the ALJ provided "no

explanation as to why [he] believes public contact would cause irritants, yet being around coworkers and supervisors would not."  [Id. at 31.]  She concludes that the VE "did not limit the irritants to the public and it would not be plausible to do so" and, therefore, the ALJ did not meet his burden at step five of the sequential evaluation process.  [Id.]

### 3.  Analysis

The Court notes that the ALJ's consideration of the medical record, including the opinions of plaintiff's treating providers, and his RFC determination are closely intertwined with the step two issue relating to the ALJ's failure to properly consider plaintiff's diagnoses of hyperosmia, vasomotor rhinitis, and multiple chemical sensitivity at step two.  By necessity, the ALJ's reconsideration on remand at step two of plaintiff's diagnoses of hyperosmia, chronic rhinitis, and multiple chemical sensitivity, will require the ALJ to reconsider the whole record, including the opinions of plaintiff's treating providers, especially as they relate to these diagnoses, and to also reconsider plaintiff's RFC.  Accordingly, the Court will not further consider these issues herein.

### VI.

### REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (citation omitted).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  Id. (citing Garrison, 759 F.3d at 1019).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Garrison, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  First, at step two, the ALJ shall consider the medical evidence of record with respect

to the severity of plaintiff's diagnoses of hyperosmia, vasomotor rhinitis, and multiple chemical sensitivity, separate and apart from her diagnosed allergies.  Second, the ALJ on remand shall reassess the medical opinions of record, including, but not limited to, the opinions of NP Mangini, Dr. Palliccia, and Dr. Ghassemi.  The ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects. Third, the ALJ on remand, in accordance with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit her testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony.  Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[8]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  August 17, 2020

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[8]    Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to perform her past relevant work as an actor.

18